IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

INTERBORO PACKAGING
CORPORATION,

    Plaintiff,

      v.

FULTON COUNTY SCHOOLS,

    Defendant.

CIVIL ACTION FILE
NO. 1:05-CV-1838-TWT

## ORDER

This is a diversity action for breach of contract and fraud.  It is before the Court on the Defendant's Motion for Summary Judgment [Doc. 44].  For the reasons set forth below, the Defendant's Motion for Summary Judgment is GRANTED.

## I. BACKGROUND

This case arises out of a contract dispute between the Plaintiff, Interboro Packaging Corporation ("Interboro"), a New York corporation engaged in the sale and distribution of garbage bags and related products, and the Defendant, Fulton County School District ("FCSD").  On September 16, 2004, FCSD issued a bid solicitation inviting vendors to bid on a requirements contract for  plastic garbage bags.  The garbage bags were to conform to detailed specifications.  For example, one of the

specifications was for a "32-gallon container, low density, 1.5 mil thickness, Size 33" wide x 54" deep, GUSSETED LINER, 200/case. Color: Black."  (Joint Ex. 6.) The invitation to bid was accompanied by an attached "Bid Conditions," which detailed the terms of the contract.

On September 28, 2004, Interboro submitted multiple bids.  In a letter dated November 15, 2004, FCSD awarded Interboro Contract Number 113-05. This letter also stated that the estimated dollar amount of the contract would be $87,000.  (Joint Ex. 14.)  Echoing language outlined in the "Bid Conditions," the letter stated that this figure was only an estimate, and that individual purchase orders would dictate the actual amount of purchases under the contract.

Almost immediately, Interboro began to quibble over the terms of the contract. On November 17, 2004, in an email from Interboro's Vice-President, Abraham Jeremias, Interboro requested that FCSD provide the "ordering cycle and quantities" for the entire year, and that FCSD change its ordering quantities from "500/case" to "1,000/case" for one of the bags.  (Joint Ex. 15.)  The next day, Interboro sent another email.  First, it indicated that rising oil prices made it imperative that FCSD provide Interboro with the entire quantity it intended to order over the course of the year. Second, Interboro requested "a sample of the bags that Fulton is currently using as to obtain information on the size and seal of the bags."  (Joint Ex. 15.)  It stated that

FCS's request of 33" x 54" and 32 gallon liner needed clarification since "[t]he size does not exactly match the gallon capacity." (Joint Ex. 16, at 3.) Third, it repeated its request that FCSD order in quantities of 1,000 as opposed to 500. (Joint Ex. 5.)

In an email dated November 19, 2004, Lonita B. Collier, FCSD's Chief Purchasing Manager, reminded Interboro that there were "no guarantees as to the amount FCS will purchase . . . and therefore, no liability for non-purchase." (Joint Ex. 16.) She dismissed the request for a sample and urged Interboro to "meet the specification outlined in the solicitation." (Joint Ex. 15, at 1.) She also rejected Interboro's request to modify the minimum orders from 500 to 1,000. (Joint Ex. 15, at 2.)

On the same day, Mr. Jeremias responded by asking Ms. Collier to "reread [his] email" so that she would notice that her "response [was] non-responsive and not meritorious." (Joint Ex. 15, at 1.) He repeated the fact that escalating prices made the need for a "realistic estimate" imperative, and described FCSD's refusal to provide an exact order quantity as "bad faith." In the meantime, FCSD requested price quotes for emergency orders for garbage liners with Central Poly, another firm that participated in the bid for contract number 113-05.

In November, Interboro submitted a letter to Wilma A. Gibbs-Matthews, Director of Purchasing Services for FCSD.[1]  This letter served as a "formal request to modify the packaging." (Joint Ex. 16.)  Insisting that its request for change was not "material," Mr. Jeremias again urged FCSD to change its minimum orders from 500 to 1,000.  Mr. Jeremias also repeated his request for further clarification of the bag specifications.  He described FCSD's bid specifications as "defective from the outset." (Joint Ex. 16, at 2.)

On November 30, 2004, Ms. Gibbs-Matthews responded in a letter that reiterated FCSD's position.  She noted that FCSD would refuse delivery of any shipments in 1,000 packs and that FCSD would stand by its initial contract specifications for the 32 gallon liner.  She informed Interboro that a failure to abide by the terms of the contract would render Interboro "non-responsive." (Joint Ex. 22, at 2.)  She complained that FCSD had been unable to place orders for garbage liners due to Interboro's continuous requests for changes to the contract.  She also referred to the "Bid Conditions" and informed Interboro that it should have clarified these issues before it bid on the contract.  She gave Interboro until December 3, 2004 to notify FCSD whether it would be able to move forward with the contract.  The letter

---

[1]The letter was dated November 22, 2004, but FCSD claims that it was transmitted on November 29.

concluded by warning Interboro that a failure to comply with the contract would put Interboro in default.

On December 2, 2004, Mr. Jeremias responded.  His letter stated that Interboro was still willing to supply the goods "pursuant to Bid 'C' and the samples submitted therein and approved by FCS."  (Joint Ex. 22, at 2.)  His position, as Interboro would later clarify, did not mean that Interboro would supply the goods as described in FCSD's bid solicitation.  Rather, Interboro meant that it was willing to supply FCSD with garbage bags that conformed to the samples that it had submitted during the bidding process.  Interboro contended that FCSD's acceptance of the September 28, 2004 bid either constituted a waiver of the original terms of the contract or a counteroffer and that as long as its samples conformed to those specifications, Interboro met the requirements of the contract.  (Pl.'s Resp. to Def.'s Mot. for Summ. J., at 50.)  The September 28 letter stated that:

> All shipments made consistent with the enclosed samples will be deemed in full conformance with bid specifications.  We are relying upon approval of these samples for compliance of its bid and will ship only such bags, in the specified size/color.  Acceptance of our bid shall conclusively constitute approval of the enclosed samples as conformity with bid specifications.

(Joint Ex. 7.)  Thus, according to Interboro, the actual wording of the contract became irrelevant.  It would later argue that it was entitled to provide "flat" as opposed to

"gusseted" bags, based on FCSD's acceptance of the samples. (Pl.'s Resp. to Def.'s Mot. for Summ. J., at 54-56.)

The very same September 28 letter also stated, however, that the samples submitted would be different than the actual bags that Interboro would ultimately provide in the event that it won the contract. (Joint Ex. 7.) The letter explicitly claimed "Upon approval of our bid *we shall manufacture the bags exactly according to the specified size/color.* The purpose of the samples is to test the strength of the bag and the material we are offering. These samples do serve this purpose." (Joint Ex. 7.) Although Interboro professed its willingness to perform under the contract in its December 2, 2004 letter, it was not willing to perform as FCSD had originally envisioned.

On December 17, 2004, Tommie S. Goodgames, a purchasing agent for FCSD, identified various problems with Interboro's bags. He indicated that the bags were the wrong kind (straight bottom seam as opposed to gusseted), the box weights were inconsistent, and that the liners were less than "the required 1.5 mil that were ordered." (Joint Ex. 12, at 2.) He requested that the defective bags be picked up and replaced. Mr. Goodgames gave Interboro until January 3, 2005, to inform FCSD in writing that the problems would be fixed. Mr. Goodgames threatened to terminate the

contract for default if the matter was still unresolved by January 5. (Joint Ex. 12, at 2.)

On December 20, 2004, Mr. Jeremias wrote an eight page, line by line response to every problem raised by FCSD. Mr. Jeremias called FCSD's complaints "baseless and without merit," evidence of "bad faith," and even suggested that an anonymous competitor of Interboro's had "devised, fabricated, and concocted" these complaints. (Joint Ex. 28.) The letter went on to state that Georgia's Attorney General, the District Attorney, and the U.S. Attorney ought to investigate the "false Complaints (sic) and the intervention by Interboro's competitor." (Joint Ex. 28.) It concluded by informing FCSD that Interboro was suspending the manufacturing process until it could be reassured that FCSD would accept the bags in conformity with the samples.

On February 7, 2005, counsel for FCSD submitted a letter to Interboro's counsel requesting that Interboro pick up the defective bags and deliver the gusseted bags requested in the bid solicitation. He further stated that failure to cure the problem would result in termination for default without penalty. (Joint Ex. 31.) On February 9, 2005, Interboro's counsel informed FCSD that it had no choice but to commence litigation. (Joint Ex. 32.) On February 18, 2005, FCSD's counsel informed Interboro that the cure period had passed. It formally terminated the contract, not for default, but for convenience. (Joint Ex. 13.) The letter referenced Section III (6) of

the contract between the parties which reads: "TERMINATION FOR CONVENIENCE."  According to the contract, this section provides FCSD with the power "to terminate for convenience a contract awarded through this solicitation."  (Joint Ex. 5.)  On July 13, 2005, the Plaintiff filed a complaint in this Court, alleging the following: (1) breach of the implied duty of good faith and fair dealing; (2) breach of contract; (3) fraud and fraud in the inducement; and (4) a request for specific performance.

## II. MOTION FOR SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate only when the pleadings, depositions, and affidavits submitted by the parties show that no genuine issue of material fact exists and that the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  The court should view the evidence and any inferences that may be drawn in the light most favorable to the nonmovant.  Adickes v. S.H. Kress & Co., 398 U.S. 144, 158-59 (1970).  The party seeking summary judgment must first identify grounds that show the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986).  The burden then shifts to the nonmovant, who must go beyond the pleadings and present affirmative evidence to show that a genuine issue of material fact does exist.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 257 (1986).

## III. <u>DISCUSSION</u>

### A.  <u>Breach of the Implied Duty of Good Faith and Fair Dealing</u>

Interboro alleges that FCSD breached the implied duty of good faith and fair dealing by "wrongfully terminating the Contract under the guise of a Termination for Convenience." (Compl., ¶ 46.)  Georgia's Uniform Commercial Code provides that "every contract or duty within this title imposes an obligation of good faith in its performance or enforcement."  O.C.G.A. § 11-1-203.  Nonetheless, the "failure to act in good faith in the performance of contracts governed by the UCC does not create an independent claim for which relief may be granted."  <u>American Casual Dining, L.P. v. Moe's Sw. Grill, L.L.C.</u>, 426 F. Supp. 2d 1356, 1370 (N.D. Ga. 2006) (citing <u>Stuart Enters. Int'l, Inc. v. Peykan, Inc.</u>, 252 Ga. App. 231, 234 (2001)).  By the same token, "the common law requirement of good faith and fair dealing is not an independent source of duties for the parties to a contract."  <u>Id.</u>  The covenant "modifies the meaning of all explicit terms in a contract, preventing a breach of those explicit terms <i>de facto</i> when performance is maintained <i>de jure</i>."  <u>Stuart Enters., Int'l, Inc.</u>, 252 Ga. App. at 234.  Thus, a Plaintiff must allege a violation of an actual term of an agreement.  <u>Id.</u>  "General allegations of breach of the implied duty of good faith and fair dealing not tied to a specific contract provision are not actionable."  <u>Alan's of Atlanta, Inc. v. Mintola Corp.</u>, 903 F.2d 1414, 1429 (11th Cir. 1990).

In the Eleventh Circuit, "the general rule is that 'termination for convenience' clauses permit one party to terminate a contract, even in the absence of fault or breach by the other party, without suffering the usual financial consequences of breach of contract." Harris Corp. v. Giesting & Associates, Inc., 297 F.3d 1270, 1272 (11th Cir. 2002) (citing Stock Equip. Co. v. Tenn. Valley Auth., 906 F.2d 583 (11th Cir. 1990). The phrase "termination for convenience" is treated as the functional equivalent of a provision allowing termination "without cause." Id. at 1273 (finding a termination for convenience clause "not ambiguous because the meaning of the phrase is plain on its face insofar as it permits termination without cause").

"There can be no breach of an implied covenant of good faith where a party to a contract has done what the provisions of the contract expressly give [it] the right to do." Rotech Healthcare, Inc. v. Chancy, 392 F. Supp. 2d 1372, 1375 (M.D. Ga. 2005) (quoting Southern Business Machines of Savannah, Inc. v. Norwest Fin. Leasing, Inc., 194 Ga. App. 253, 256 (1990)).  See also Harris Corp., 297 F.3d at 1273 (discussing the "general rule that conduct which is expressly authorized by a contract cannot be said to breach the implied covenant of good faith and fair dealing").  FCSD is not liable for breach of the implied duty of good faith and fair dealing.

B. Breach of Contract

Interboro concedes that the contract contained a "termination for convenience"

provision.  Drawing upon Torncello v. United States, 681 F.2d 756 (Ct. Cl. 1982),

Interboro argues that a termination for convenience clause (1) cannot be invoked in

"bad faith," and (2) can only be used when there has been a "change in the

circumstances" of the bargain.  (Pl.'s Resp. to Def.'s Mot. for Summ. J., at 4.)

Interboro describes the case as "seminal" and invites the Court to treat it as the law of

the Eleventh Circuit.  The Court, however, declines to treat Torncello as binding law.

Its major premise rests on shaky ground.  The case has been heavily criticized and its

scope has been whittled down over the past quarter-century.  See Salsbury Industries

v. United States, 905 F.2d 1518, 1521 (Fed. Cir. 1990) ("[Torncello] stands for the

unremarkable proposition that when the government contracts with a party knowing

full well that it will not honor the contract, it cannot avoid a breach claim by adverting

to the convenience termination clause.") ; see also Custom Printing Co. v. United

States, 51 Fed. Cl. 729, 734 (Ct. Cl. 2002) ("The 'changed circumstances' test to

which the plaintiff alludes, set out by the plurality in Torncello, has been explicitly

rejected by the United States Court for the Federal Circuit.").

In this diversity case, the Court must follow Georgia law.  There are no Georgia

cases applying  Torncello to a requirements contract between a governmental entity

and a private contractor.  Applying Florida law, the Eleventh Circuit has said that a termination for convenience clause cannot shield the terminating party from "liability for bad faith or fraud." Id. at 1272-73. It is well established in Georgia that there is a presumption that public officials "perform their duties lawfully, and in good faith." Butts v. State, 193 Ga. App. 824, 826 (1989).  Interboro has not overcome this presumption.  It is undisputed that the contract went sour very quickly.  It is undisputed that there were serious disagreements between the parties before FCSD terminated the contract. Rather than identify any facts which raise an inference of "bad faith," Interboro relies upon a series of wild speculations regarding the motives for FCSD's desire to terminate the contract and labels these speculations as "inferences" of bad faith that a jury could make.[2]  Indeed, Interboro has failed to put forth any principled definition of what might constitute "bad faith," or why the facts it has isolated demonstrate bad faith in the use of the termination for convenience provision.

---

[2]Interboro alleges that: (1) it was treated "differently" than Central Poly, another bidder; (2) Ms. Collier warned Interboro of the consequences of failing to meet its obligation under the contract; (3) Ms. Collier "flatly refused to clarify her specifications;" (4) FCSD disagreed with Interboro's interpretation of the September 28, 2004 letter as an amendment to the terms of the contract; (5) FCSD requested emergency price quotes from Central Poly before it determined that Interboro sold defective bags; (6) FCSD did not want garbage bags that conformed to Interboro's samples; (7) speculation, based on the absence of any evidence, that FCSD withheld information from its own purchasing agents; and (8) FCSD's request from its school for feedback on the quality of Interboro's bags.

If Interboro's laundry list of grievances amounts to "bad faith," then any termination for convenience "will almost always be *characterizable* as bad faith." Corenswet, Inc. v. Amana Refrig., Inc., 594 F.2d 129, 138 (5th Cir. 1979) (emphasis added).

The evidence, even viewed in the light most favorable to Interboro, does not demonstrate "bad faith" or show that FCSD entered into the contract knowing full well that it would not honor the agreement. As is obvious from the correspondence, the parties bickered over the meaning of the contract from its inception, and their relationship appeared to deteriorate almost immediately. See Embrey v. United States, 17 Cl. Ct. 617, 624 (Ct. Cl. 1989) (upholding "deterioration in business relationship" as good faith evidence of "changed circumstances"). Evidence of business disputes, or even personal disputes, does not raise an inference of "bad faith." To the contrary, the facts of this case show that termination for convenience "clauses can have the salutary effect of permitting parties to end a soured relationship without consequent litigation." Corenswet, Inc., 594 F.2d at 139. FCSD's legitimate use of the termination for convenience clause warrants summary judgment for the Defendant on the issue of whether FCSD breached the contract with Interboro.

C. <u>Fraud</u>

Interboro's remaining claim is fraud.  It alleges, in essence, that FCSD acted fraudulently by: (1) inducing Interboro to enter into the contract even though FCSD never intended on honoring the agreement; (2) inducing Interboro, through written and oral statements, into purchasing a year's worth of garbage liners; and (3) cancelling the contract when "there would be no reason that Interboro should think that after winning the bid in a competitive bidding process that its contract would be terminated."  (Pl.'s Resp. to Def.'s Mot. for Summ. J., at 61.)

"Under Georgia law, the elements of fraud are (1) false representation, (2) scienter, (3) intention to induce plaintiff to act or refrain from acting, (4) justifiable reliance by plaintiff, and (5) damage to plaintiff."  <u>Option One Mortgage Corp. v. Allstate Ins. Co.</u>, 2006 WL 2285358, at *9 (N.D. Ga. Aug. 3, 2006).  <u>See</u> <u>also</u> <u>Cramp v. Georgia-Pacific Corporation</u>, 266 Ga. App. 38, 40 (2004).  Proof of fraud requires more than merely breaking a promise, inaccurately predicting an event, or engaging in erroneous conjecture.  <u>Fuller v. Perry</u>, 223 Ga. App. 129, 132 (1996).

The Plaintiff has failed to produce any evidence to support this claim.  There is no evidence suggesting that FCSD entered into the contract without any intention of honoring it.  In fact, FCSD explicitly notified Interboro that it would only pay for garbage bags that were delivered pursuant to a purchase order.  Interboro was not

entitled to rely upon any estimate of the number of garbage bags to be ordered by the FCSD.  FCSD made clear that Interboro was not to rely upon any projections, oral or written, regarding the number of bags that FCSD might order.   Although the November 15, 2004 letter awarding the contract to Interboro provided an estimate of the year's purchases it also emphasized that "[c]ontract performance on this contract, i.e., delivery of items will be as per specific purchase orders."  (Joint Ex. 14.)  In addition, the termination for convenience clause should have notified Interboro that the contract was subject to cancellation.  The Defendant's Motion for Summary Judgment on Interboro's fraud claims should be granted.

## IV. CONCLUSION

For the reasons set forth above, the Defendant's Motion for Summary Judgment [Doc. 44] is GRANTED.

SO ORDERED, this 27 day of September, 2006.


/s/Thomas W. Thrash
THOMAS W. THRASH, JR.
United States District Judge